UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AUSTIN LAWYERS GUILD; CARL GOSSETT, DAVID GRASSBAUGH, MARK SAMPSON, and FRANCIS WILLIAMS, for themselves and those similarly situated; and the PRISON JUSTICE LEAGUE, | § § § § § § | Cause No. 1:14-cv-00366-LY |
| Plaintiffs | § | |
| v. | § | |
| | § | |
| SECURUS TECHNOLOGIES, INC; TRAVIS COUNTY SHERIFF'S OFFICE, and GREG HAMILTON, in his official capacity; TRAVIS COUNTY DISTRICT ATTORNEY'S OFFICE, and ROSEMARY LEHMBERG, in her official capacity; and TRAVIS COUNTY ATTORNEY'S OFFICE, and DAVID ESCAMILLA, in his official capacity. | § § § § § § § § § § | |
| Defendants. | § | |

**EXHIBIT A**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RENEWED MOTIONS TO DISMISS**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AUSTIN LAWYERS GUILD; CARL GOSSETT, DAVID GRASSBAUGH, MARK SAMPSON, and FRANCIS WILLIAMS, for themselves and those similarly situated; and the PRISON JUSTICE LEAGUE, | § § § § § § § | Cause No. 1:14-cv-00366-LY |
| Plaintiffs | § | |
| v. | § § | |
| SECURUS TECHNOLOGIES, INC; TRAVIS COUNTY SHERIFF'S OFFICE, and GREG HAMILTON, in his official capacity; TRAVIS COUNTY DISTRICT ATTORNEY'S OFFICE, and ROSEMARY LEHMBERG, in her official capacity; and TRAVIS COUNTY ATTORNEY'S OFFICE, and DAVID ESCAMILLA, in his official capacity. | § § § § § § § § § § | |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RENEWED MOTIONS TO DISMISS**

Plaintiffs respectfully offer this Response to Defendants' renewed motions to dismiss (Docket Entries 27, 28, 29). Fundamentally, none of Defendants' arguments have sought to justify the underlying issue – they are unlawfully recording and reviewing privileged attorney-client phone calls. Rather, their motions cite procedural defenses.

Defendants' motions should be denied. Plaintiffs have successfully articulated claims under the Federal and Texas Wiretap Acts and the U.S. Constitution, and have standing to assert them in this Court.

FACTS

Officials with the Travis County Sheriff's Department, along with Securus Technologies, a private telephone vendor, record all telephone calls to-and-from inmates in the county jail. They tell attorneys, inmates, and the public that calls between attorneys and their clients are

treated differently – that they are not recorded. This, however, is not true.

Calls between attorneys and their clients in the Travis County Jail and Travis County Correctional Complex are recorded and stored in an electronic database along with every other phone call to-or-from an inmate. Local law enforcement officials – including the Sheriff's Department, the County Attorney's Office, and the District Attorney's Office – have ready, online access to those recordings. Attorneys in the respective prosecutors' offices routinely review the recordings, even though they contain privileged, attorney-client communication. Defendants are all aware this is happening, and that it materially prejudices county detainees' criminal cases.

Plaintiffs are a group of individual attorneys who practice criminal defense and seek to represent a class of attorneys similarly situated. Along with them are two organizations – one composed of attorneys, another composed of inmates (including county detainees) – who have standing to pursue injunctive relief on behalf of their members. They assert Defendants' actions violate both the attorneys' and detainees' rights under the Federal and Texas Wiretap Acts and violate the detainees' constitutional rights. They are asking the Court to enjoin further eavesdropping.

STANDARD OF REVIEW

Motions to dismiss are "viewed with disfavor and [are] rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). A plaintiff is not required to prove up his case in his pleadings. A complaint only needs to "allege enough facts to move the claim across the line from conceivable to plausible." *Id.* "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted).

The *Iqbal/Twombly* pleading standard does not require a complaint to include detailed factual allegations. *Colony Ins. Co. v. Peachtree Const*., 647 F.3d 248, 252 (5th Cir. 2011). It only requires complaints to do "more than [set forth] labels and conclusions, and a formulaic recitation of the elements of a cause of action…" *Id*. (citing *Twombly*, 550 U.S. at 555). The Supreme Court in *Twombly* simply overruled the old pleading standard that allowed pleadings to survive as long as their allegations were not facially impossible. *Twombly*, 550 U.S. at 561 (citing *Conley v. Gibson*, 355 U.S. 41 (1957)). The new pleading standard from *Twombly* only requires plaintiffs' allegations to "nudge[] their claims across the line from conceivable to plausible" (*id*. at 570) by "plausibly suggesting" wrongdoing. *Id*. at 557.

Plaintiffs' amended complaint alleges facts to justify their claims. Therefore, Defendants' motions should be denied.

ARGUMENT

## A. Plaintiffs' pleadings show violations of the U.S. Constitution, federal law, and state law.

1. <u>Recording privileged attorney-client calls violates both attorneys' and detainees' rights under the Texas and Federal Wiretap Acts</u>

Securus Technologies and the Sheriff's Department tell the public they do not record attorneys' calls with detainees. (D.E. 25, para 15) They also lead detainees to believe calls with their attorneys will not be recorded. (D.E. 25, para 10, 15). But in reality, they do record confidential calls between attorneys and their clients, and then disclose those recordings to prosecutors, who use them to the detainees' disadvantage. (D.E. 25, para 16-17).

Defendants do not seriously contest that recording calls in these circumstances implicate the prohibitions of the Texas and Federal Wiretap Acts. *See U.S. v. Amen*, 831 F.2d 373, 378 (2nd Cir. 1987) (the Federal Wiretap Act "clearly applies to prison monitoring"); *Adams v. City of Battle Creek*, 250 F.3d 980, 984-85 (6th Cir. 2001) ("even prisoners are entitled to some form of notice" that a call will be monitored); *Lonegan v. Hasty*, 436 F.Supp.2d 419, 432 (E.D.N.Y.

3

2006) ("in the prison setting, attorney-client communications generally are distinguished from other kinds of communications and exempted from routine monitoring"). Nor do they argue prosecutors' use of those recordings does not implicate the Texas and Federal Wiretap Acts. *Peavy v. WFAA-TV, Inc*., 221 F.3d 158, 174 (5th Cir. 2000). *See Dorris v. Absher*, 179 F.3d 420, 426 (6th Cir. 1999); *Lewton v. Divingnzzo*, 772 F.Supp.2d 1046, 1059 (D.Neb. 2011) (*citing Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992)).

Rather, Defendants argue they fall into various exceptions to the rule. They are incorrect.

- Federal: The "ordinary course of business" exception does not apply.

The Federal Wiretap Act prohibits individuals from intercepting communications by using "electronic, mechanical, or other device[s]." But it excludes from the definition of devices

> any telephone or telegraph instrument, equipment or facility, or any component thereof… being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties.

18 U.S.C. §§ 2510(4), (5)(a)(ii). Courts refer to this language as the "ordinary course of business" and "law enforcement" exceptions. Neither exception applies in this case.

The "ordinary course of business" exception fails for three separate reasons. First, the meaning of "telephone or telegraph instrument, equipment or facility" is limited to equipment that directly facilitates communication between two parties. *See Sanders v. Robert Bosch Corp*, 38 F.3d 736, 740-41 (4th Cir. 1994) ("The voice logger in no way furthers the [defendant's] communication system"). But Securus' interception, storage, and sharing of Plaintiffs' confidential attorney-client calls relies on hardware (servers, electronic storage, cables, and software) entirely separate from what is necessary to transmit the callers' voices to each other; and the interception is neither necessary nor incidental to providing telephone service. (D.E. 25,

para 12). Therefore, that equipment falls outside the statute's narrow definition of telephone equipment, which is the necessary predicate for the "ordinary course of business" exception.[1]

Second, Defendants' interception of Plaintiffs' calls falls outside their "ordinary course of its business" because the interception conflicts with Defendants' ostensible policy. Securus and the Sheriff's Department tell the public they do not record attorneys' calls with detainees, and they lead detainees to believe calls with their attorneys will not be recorded. (D.E. 25, para 10, 15). As recently as August 8, 2013, Major Darren Long, the Sheriff's jail administrator, told defense attorneys "They [the calls between attorneys and clients] are not recorded or listened to by my staff. The only way that could happen is if there was court order for us to do so." (D.E. 25, para 15). Defendants' statements equate to what should be regarded as their "ordinary course of business," for purpose of the exception.[2] Defendants, by acting in violation of their own ostensible policy, cannot show that invading attorney-client communications falls within the "ordinary course of business" exception.

Third, Defendants' interception of Plaintiffs' calls falls outside "the ordinary course business" because it is done covertly, without notice to the parties. "[M]onitoring in the ordinary course of business requires notice to the person or persons being monitored." *Adams*, 250 F.3d at 984. "[T]he courts have ruled that even prisoners are entitled to some form of notice that such conversations may be monitored or recorded." *Id.* at 984-85 (collecting cases). Some Circuits have found covert recording can be legitimate if being covert is itself justified by a legitimate

---

[1] *See In re Google*, 2013 WL 5423918 *10 (N.D.Cal. 2013) ("the legislative history supports a narrow reading… under which an electronic communication service provider must show some link between the alleged interceptions at issue and its ability to operate the communication system").

[2] *See Berry v. Funk*, 146 F.3d 1003, 1009-10 (D.C. Cir. 1998) ("Operation Center guidelines… clearly indicate the norm of behavior the Watch Officers were to follow and which must be regarded as the ordinary course of business for the Center"); *see also In re Google*, 2013 WL 5423918 *8 ("Plaintiffs' allegations that Google violated Google's own agreements and internal policies with regard to privacy also preclude application of the ordinary course of business exception").

purpose (*Sanders v. Robert Bosch Corp*, 38 F.3d 736, 741-42 (4th Cir. 1994)), but Defendants have no legitimate reason to invade attorney-communication, either overtly or covertly. (D.E. 25, para 16). Defendants' choice to act covertly is a fatal defect to asserting the "ordinary course of business" exception.

- Federal: The "law enforcement exception" does not apply.

The Federal Wiretap Act also creates an exception for interceptions made with "telephone or telegraph instrument, equipment or facility… by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii). But the exception is limited to routine, non-investigative recording:

> Investigation is within the ordinary course of law enforcement, so if "ordinary" were read literally warrants would rarely if ever be required for electronic eavesdropping, which was surely not Congress's intent. Since the purpose of the statute was primarily to regulate the use of wiretapping and other electronic surveillance for investigatory purposes, "ordinary" should not be read so broadly; it is more reasonably interpreted to refer to routine noninvestigative recording of telephone conversations.

*Amati v. City of Woodstock*, 176 F.3d 952, 955 (7th Cir. 1999).

The law enforcement exception fails for two reasons. First, for reasons stated above, Defendants do not satisfy the predicate to the law enforcement exception – that the interception be performed with normal telephone equipment. *See supra* (citing *Sanders*, 38 F.3d at 740-41 and *In re Google*, 2013 WL 5423918 *10). Defendants' equipment for intercepting the calls are not normal telephone equipment.

Second, it is not within a law enforcement official's duty to unlawfully invade privileged attorney-client communications – particularly doing so covertly, without a warrant issued by a magistrate, and in violation of the officials' ostensible policy with respect to those communications.

What would not be routine would be if the police, in order to trick people into making damaging admissions over the phone, announced that calls to and from the police department were *not* being recorded, and then recorded them anyway. Such a scheme would not be in the "ordinary" course of law enforcement; it would be extraordinary.

*Amati*, 176 F.3d. at 956. *See also Lonegan*, 436 F.Supp.2d at 432 n.7 ("the facts alleged in the complaint provide no basis for applying the ordinary course of law enforcement duties exception because... defendants were not acting pursuant to federal policy but, rather, were violating it").

There's nothing ordinary about law enforcement officers violating their own stated policies, in order to secretly violate the Constitution, federal law and state law. Their own ostensible policy must be regarded as the norm for their ordinary course of conduct. *See Berry*, 146 F.3d at 1009 and *In re Google*, 2013 WL 5423918 *8. For these reasons, the law enforcement exception also fails.

- Texas: The "ordinary use" exception does not apply.

The Texas Wiretap Act, similar to federal law, prohibits the interception of transmitted communication, but excludes interceptions made through the "ordinary use of... a telephone or telegraph instrument or facility or telephone and telegraph equipment." TEX. CIV. PRAC. & REM. CODE §123.001(2)(A). There are fewer cases analyzing the state law, but Courts have held it is reasonable to interpret it in light of similar federal provisions. *See Pedro v. State*, 2007 WL 619492 *7 (Tex.App.-Austin 2007) (citing *Castillo v. State*, 810 S.W.2d 180, 183 (Tex.Crim.App.1990)). And for similar reasons, Defendants' actions fall outside this exemption.

First, as the brief describes above (citing *Sanders*, 38 F.3d at 740-41 and *In re Google*, 2013 WL 5423918 *10), Defendants' invasion of Plaintiffs' conversations is not done with the normal telephone equipment envisioned in this section of the statute. The equipment Defendants use to intercept, record, and share Plaintiffs' calls neither facilitates those telephone calls, nor are

the recordings a necessary incident of the calls. (D.E. 25, para 12). For that reason, the interceptions fall outside the ordinary use exception.

Second, as the brief also describes above (citing *Amati*, 176 F.3d at 956; *Lonegan*, 436 F.Supp.2d at 432 n.7; and *Berry*, 146 F.3d at 1009), there's nothing ordinary about law enforcement officers violating their own stated policies, to secretly violate the Constitution, federal law and state law. As a result, Defendants' actions fall outside the "ordinary use" exception.

- Texas: The "common carrier" defense does not apply.

The Texas Wiretap Act also includes a "common carrier" defense:

> A switchboard operator or an officer, employee, or agent of a communication common carrier whose facilities are used in the transmission of a wire communication may intercept, disclose, or use a communication in the normal course of employment if engaged in an activity that is necessary to service or for the protection of the carrier's rights or property. A communication common carrier may not use service observation or random monitoring except for mechanical or service quality control checks.

TEX. CIV. PRAC. & REM. CODE §123.003(a).[3] The defense fails in this case because Securus Technology's invasion of Plaintiffs' calls is not "an activity that is necessary to [the] service" or to protect its "rights or property."

The first portion of the defense, "an activity that is necessary to service," is sometimes called the "switchboard defense." It is inapplicable in this case. The Fifth Circuit analyzed a nearly-identical section of the federal statute in *U.S. v. Savage*, in which a switchboard operator overheard an incriminating statement during a brief snippet of a conversation while she was connecting a call. 564 F.2d 728, 730 (5th Cir. 1977). The Court concluded that overhearing this

---

[3] This language is nearly identical to language in the federal statute at 18 U.S.C. § 2511(2)(a)(i), except it exchanges the phrase "activity that is necessary to service" for "activity which is a necessary incident to the rendition of his service."

statement was a "necessary incident to the rendition of service," and therefore not a violation of the Federal Wiretap Act. *Id*. 731-32 ("It was solely by accident, then, that [the switchboard operator] overheard the first few words of the telephone call"). However, the Court also concluded that going out of her way to monitor a second call at the urging of a police officer was unlawful. *Id*. at 731.

This distinction makes sense because it would be impossible for a switchboard operator to avoid hearing small snippets of conversation.

> A switchboard operator is authorized to overhear (and disclose and use) only that part of a conversation "which is a necessary incident to the rendition of his service." We think it rather obvious from the statutory language that Congress recognized switchboard operators, when connecting calls, inevitably would overhear a small part of a call, but the exception permitting them to use that content is limited only to that moment or so during which the operator must listen to be sure the call is placed.

*Berry*, 146 F.3d at 1010 (citing *Savage*, 564 F.2d 728). But a switchboard operator "is never authorized simply to monitor calls." *Id*. In our case, Securus' invasion was far greater and longer than the few seconds a switchboard operator unavoidably hears when connecting a call. Monitoring Plaintiffs' calls is not necessary to the provision of its service (D.E. 25, para 12), so it is not protected by this provision.

The second portion of the defense, intercepting a communication "for the protection of the carrier's rights or property" is also inapplicable. Its scope is limited to allowing a telephone company to identify people circumventing its billing process. *U.S. v. Clegg*, 509 F.2d 605, 612 (5th Cir. 1975); *see also Savage*, 564 F.2d at 731 ("Congress intended to permit telephone companies to monitor telephone communications in order to determine if callers were using 'blue boxes' to avoid paying for long-distance telephone calls"). This has no bearing on Defendants' practice of invading Plaintiffs' communications. *See Campiti v. Walonis*, 453 F.

9

Supp. 819, 824 (D.Mass. 1978) (monitoring prisoners' calls did not protect carrier's property, therefore, the common carrier defense did not apply). This defense has no bearing on the matters at hand.

    2.    <u>Defendants' invasion of attorney-client communications sufficiently threaten the Sixth Amendment "right to counsel" to warrant injunctive relief</u>

Pretrial detainees have a Sixth Amendment right to counsel, which includes confidential attorney-client communications. *See Woodruff v. State*, 330 S.W.3d 709, 724 (Tex.App.– Texarkana 2010) (pet. denied) (it was "beyond dispute" that the DA's instructions to the Sheriff to record detainee's calls with his attorney violated the Sixth Amendment).

> [T]he interests at stake in the attorney-client relationship are unlike the expectations of privacy that underlie the fourth amendment exclusionary rule. The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself…. In order for the adversary system to function properly, any advice received as a result of a defendant's disclosure to counsel must be insulated from the government.

*U.S. v. Levy*, 577 F.2d 200, 209 (3rd Cir. 1978). Proving a violation of the Sixth Amendment requires a showing of prejudice to a criminal defendant's case. *U.S. v. Davis*, 226 F.3d 346, 353 (5th Cir. 2000). Prejudice may be more readily demonstrated depending on the nature of the invasion – trial strategy is more precious than evidence. *See U.S. v. Danielson*, 325 F.3d 1054, 1070 (9th Cir. 2003).

In this suit, Plaintiffs are requesting injunctive relief because the Sheriff's Department and Securus' practice of recording attorney-client communications, and prosecutors' practice of reviewing those recordings, create an unreasonable risk of prejudicing detainees' cases in violation of the Sixth Amendment. (D.E. 25, para 23). Plaintiffs are not required to show

Defendants' practices will violate the Sixth Amendment in every instance – merely that they create a serious risk of harm. *See infra*, Section 4.

Further, even if detainees' attorneys chose to eschew speaking on the phone entirely and only met with them person, Defendants' practices would also violate detainees' Sixth Amendment rights if. The Sheriff's Department implemented a policy on June 1, 2013, which prevents attorneys from sending non-attorney staff to visit inmates – as of that date, only attorneys, private investigators, and polygraph operators are permitted to have legal visits with Travis County detainees.[4] (D.E. 25, para 25). Exclusively visiting detainees in person requires an excessive investment of time, which interferes with the routine consultation that is necessary for the attorneys to represent those detainees. (D.E. 25, para 26-29). That interference violates the Sixth Amendment because there is no security concern justifying it.[5]

Prejudicing a detainee's case by invading privileged attorney-client communication, or by unreasonably interfering with access to counsel, violates the Sixth Amendment. Detainees at Travis County Jail and the Correctional Complex are all at substantial risk that harm.

3. Defendants' invasion of attorney-client communications sufficiently interfere with detainees' constitutional right of "access to the courts" to warrant injunctive relief

---

[4] The Supreme Court found a similar policy (in which a prison prohibited law students and paralegals from conduct attorney-client interviews with inmates) unconstitutional in *Procunier v. Martinez* because it was an "unjustifiable restriction on the right of access to the courts." 416 U.S. 396, 419-20 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

[5] *See Benjamin v. Fraser*, 264 F.3d 175, 179-80 (2nd Cir. 2001) (policies that burdened detainee's counsel with unnecessary delays of 40 minutes to 2 hours violated detainees' right to counsel); *see also Cobb v. Aytch*, 643 F.2d 946, 957 (3rd Cir.1981) (transferring pretrial detainees to more distant facilities significantly interfered with their right to counsel); *Tucker v. Randall*, 948 F.2d 388, 390–91 (7th Cir. 1991) (the Sixth Amendment would be implicated by denying pre-trial detainee the opportunity to speak with his attorney on the phone for four days).

Pretrial detainees have a constitutional right to access the courts. Courts variously attribute this right to the First, Fifth, and/or Fourteenth Amendments,[6] and treat it somewhat differently for pretrial detainees than post-conviction prisoners,[7] but they all agree it is a fundamental right. "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419-20 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989) (noting the time required for attorneys to travel to remote locations would "waste time that might be employed more efficaciously in working on the inmates' legal problems").

Restricting detainees' ability to consult with counsel by phone, without a reasonable security justification, violates detainees' right to access the courts.[8] *Robinson v. Gunja*, 92 Fed.Appx. 624, 627 (10th Cir. 2004) (a prisoner's right to telephone access is "subject to rational limitations in the face of legitimate security interests of the penal institution"). "[A]n inmate's right to phone calls is to be protected, especially if the call is to a lawyer, bail bondsman or other

---

[6] *See, e.g. Jaramillo v. Bexar County, Texas*, 2011 WL 1655892 *1, n.4 (W.D.Tex. 2011) (collecting cases); *see also U.S. v. Neff*, 2013 WL 30650 *5 (N.D.Tex. 2013) (citing *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989)).

[7] *See, e.g. Neff*, 2013 WL 30650 at 5 (distinguishing *Lewis v. Casey,* 518 U.S. 343 (1996) as a case that dealt with post-conviction detainees); *see also Benjamin v. Fraser*, 264 F.3d 175, 185 (2nd Cir. 2001) (same).

[8] Defendants quote a statement from *Brewer v. Wilkinson,* which says: "the Supreme Court has not extended [a prisoner's right of access to the courts] to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court." 3 F.3d 816, 821 (5th Cir. 1993). This statement is misleading at first glance.

Immediately after the statement, the Fifth Circuit cites the Supreme Court's *Procunier v. Martinez* opinion, with the parenthetical statement "determining that the right of access to the courts prohibits prison officials from unreasonably limiting an inmate's access to legal personnel who can provide essential legal advice." *See Brewer*, 3 F.3d at 821 (*citing Procunier v. Martinez*, 416 U.S. 396, 419-22 (1974). Clearly the Circuit in *Brewer* meant the words "preparing… legal documents" in the broadest possible sense, including inmates' effective communication with their attorneys.

party who will aid the inmate for preparing for his trial." *Detainees of Allegheny County Jail v. Wecht*, 565 F.Supp. 1278, 1284 (D.C.Pa. 1983); s*ee also Jaramillo v. Bexar County, Texas*, 2011 WL 1655892 *1, n.4 (W.D.Tex. 2011) (collecting cases stating detainees' confidential calls with attorneys cannot be limited without a valid security justification).

Defendants do not have a valid security justification for invading detainees' confidential attorney-client communications. (D.E. 25, para 16). Doing so unjustifiably interferes with their access to counsel. Therefore, the practice violates detainees' right to access the courts.

4. Injunctive relief is justified to prevent irreparable harm

A court may grant injunctive relief to protect victims from irreparable injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).[9] "[A]n injury is irreparable only if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). "[T]he irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent." *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (collecting cases). Defendants' unlawful invasion of attorney-client communications poses a substantial risk of irreparable injury to detainees by compromising their constitutional rights to counsel and to access the courts. The routine and broad-based practice puts every detainee at risk. (D.E. 25, para 23).

Constitutional deprivations are, as a matter of law, irreparable injuries. *See Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *see also Cobb v. Aytch*, 643 F.2d 946, 960 (3d Cir.1981) (no remedy at law could compensate for interference with detainees'

---

[9] Plaintiffs must show (1) irreparable injury; (2) monetary damages will not repair the harm; (3) the balance of hardships between parties warrants equitable relief, and (4) an injunction would serve the public interest.

right to counsel).[10] Defendants are routinely violating detainees' constitutional rights; and both detainees' and attorneys' rights under the Federal and Texas Wiretap Acts. (D.E. 25, para 16-17). Injunctive relief is proper because money cannot remedy the harm. *Cf. ITT Educational Services, Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008) (breaching of a confidentiality agreement would cause irreparable injury). Once a state invades a confidential conversation, there's no way to put the genie back in the bottle.

Further, injunctive relief would serve the public interest. *See Speigel v. City of Houston*, 636 F.2d 997, 1002 (5th Cir. 1981) (when the defendant is the government, the public interest and balancing the harm to the parties should be considered together). An injunction protecting constitutional rights would not harm the public;[11] to the contrary, "it is always in the public interest to prevent violation of a party's constitutional rights." *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). *See also Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338-39 (5th Cir. 1981) (it is not in the public interest to "interfere with the exercise of fundamental rights").

Under the circumstances, injunctive relief is absolutely necessary.

5. A declaratory judgment should be used to define a party's rights before they suffer harm.

Declaratory judgments exist "to provide a means of settling an actual controversy before it ripens into a violation of the civil or criminal law, or a breach of a contractual duty." *Rowan*

---

[10] *See also Mills v. District of Columbia,* 571 F.3d 1304, 1312 (D.C.Cir. 2009) (search-and-seizure); *Murillo v. Musegades*, 809 F.Supp. 487, 497 (W.D.Tex. 1992) (search-and-seizure); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2nd Cir. 1984) (cruel and unusual punishment); *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (equal protection).

[11] Any harm, to be relevant, must be quantifiable. *Compare Villas at Parkside Partners v. City of Farmers Branch*, 496 F.Supp.2d 757, 776-77 (N.D. Tex. 2007) (noting that the city had failed to identify any specific, quantifiable harm that it would suffer as a result of the preliminary injunction) with *Lee v. Commissioners' Court of Jefferson County*, 81 F.Supp.2d 712, 717 (E.D. Tex. 2000) (finding that defendant city would suffer significant harm from the preliminary injunction from rising construction costs, increased financing costs, and the cost required to arrange the bond issue a second time).

*Companies, Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) (threatening harm creates a justiciable controversy); *see also Evanston Ins. Co. v. Broadway Grocery*, 2008 WL 2883803 *4 (W.D.La. 2008) (analyzing Rowan). Defendants have violated Plaintiffs' rights, and will surely do so again. (D.E. 25, para 23). The threat creates a justiciable controversy which the Court should resolve by declaring the legal rights and duties of the parties.

**B.  Plaintiffs have standing to bring the claims in this lawsuit.**

1.  <u>The individual plaintiffs are proper class representatives for the proposed class of Austin criminal defense attorneys.</u>

The individual Plaintiffs are criminal defense attorneys. They routinely represent detainees in the Jail and Correctional Center, and when they do, they are caught in a Catch 22 – either using the telephone system at risk eavesdropping, or exclusively visiting detainees in person; either devoting slavish amounts time for travel at every point warranting discussion, or delaying the normal process of consulting with clients during the course of investigating, strategizing, and discussing plea offers. (D.E. 25, para 26).

There are 996 attorneys practicing criminal defense in Austin. Virtually all are in the same position as the individual Plaintiffs. (D.E. 25, para 3). Moreover, of the 10,896 other attorneys in Austin, many will ultimately represent one or more pretrial detainees in a criminal defense matter. (D.E. 25, para 3).

Defendants questioned whether the individual Plaintiffs' claims are sufficiently typical of the proposed class. Typicality focuses on whether the "class representative's claims have the same essential characteristics of those of the putative class." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by M.D. ex rel Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012). "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Id.*

Because Defendants' posture is the same toward every attorney who represents a detainee, the Plaintiffs more than adequately satisfy the typicality prong for class certification. And together, the class members all suffer unreasonable risk of harm warranting injunctive and declaratory relief. (D.E. 25, para 42-43).

2. <u>The Austin Lawyers Guild and the Prison Justice League have standing to bring claims on behalf of their members.</u>

The Austin Lawyers Guild (ALG) is membership-based, incorporated non-profit organization, which includes a substantial number of Austin criminal defense attorneys who regularly speak with jailed clients by phone. (D.E. 25, para 4, 10). Its purpose, as set out in its bylaws, is to "promote the public interest, civil rights, and social justice." ALG's members face substantially the same risk of eavesdropping as the individual Plaintiffs and the larger defense community. (D.E. 25, para 4).

Similarly, the Prison Justice League (PJL) is also a membership-based, incorporated non-profit organization. Its members include people detained in TCCC. (D.E. 25, para 5). PJL's mission is to improve conditions of incarceration through "litigation, advocacy, and empowering [its] members." PJL's members at TCCC all face substantially the same risk that calls with their attorneys will be unlawfully monitored, recorded, and used against them. (D.E. 25, para 33-39).

An association has standing to bring suit on behalf of its members for declaratory and injunctive relief when "[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *NRA v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) (citing *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010)).

ALG member attorneys have standing to seek injunctive relief. Therefore, ALG has standing to bring suit against Defendants. Similarly, PJL's detainee members have standing to seek relief, giving PJL standing to bring suit against Defendants on detainees' claims. *See Pennsylvania Prison Society v. Cortes*, 622 F.3d 215, 230 (3rd Cir. 2010) (concluding the association had standing through "its members who are prisoners sentenced to life imprisonment").

3.  <u>ALG attorneys have third-party standing to assert the rights of their detained clients.</u>

Finally, the individual Plaintiffs and ALG have third-party standing to assert to protect the rights of their detained clients, because they satisfy the three part test showing: (1) Defendants' actions toward those detainee-clients cause injury-in-fact to their attorneys; (2) the attorneys share a close relationship with their clients; and (3) the detainees face obstacles inhibiting them from bringing the claims on their own behalf. *See Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014); *see also Powers v. Ohio,* 499 U.S. 400, 410-11 (1991) (citing *Singleton v. Wulff*, 428 U.S. 106 (1976)).

This will be even more true after the proposed class is certified, and the issues can be examined from the perspective the proposed class of 996 Austin criminal defense attorneys.

- <u>The attorneys suffer injury-in-fact</u>

To have standing, a plaintiff must show injury that is concrete and either actual or immanent, but the injury itself "need not measure more than an 'identifiable trifle'." *ACORN v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999). In the case of a professional, such as an attorney or a doctor, interfering with the business relationship with their patient or client causes an injury-in-fact.[12]

---

[12] *See Caplin & Drysdale, Chartered v. U.S.*, 491 U.S. 617, 623 n. 3 (1989) (attorney challenging forfeiture statute that interfered with defendant paying attorney fees); *U.S. Dept. of Labor v. Triplett*, 494

Defendants' interference with detainees' rights harms Plaintiffs by diminishing their income. Criminal defense attorneys must frequently consult with their clients. (D.E. 25, para 3, 24-26). As an investigation proceeds, they must confer about various case details to inform their investigation, motion practice, and trial strategy. Traveling to the jail, moving through security, waiting for shift change, waiting for lockdowns, waiting for jail staff to find and bring an inmate to the visitation area, then waiting for a client to appear in the visitation room all take time – frequently, a significant amount of time. A call that could have been conducted in ten minutes may require a three-hour round trip. (D.E. 25, para 26).

Meanwhile, these attorneys are either changing clients a flat fee, meaning an increased time commitments for each client cut into their income; or they are charging an hourly fee, and fewer potential clients will be able to afford the cost of representation. Either way, attorneys suffer an injury, in the form of reduced income, as a result of Defendants' invasion of detainees' rights. Appointed attorneys are especially harmed, because they never receive hourly compensation. They are paid a few hundred dollars for a plea or a small amount more if the case goes to a trial. They are not compensated for time spent waiting for in-person visits at the Jail or the Correctional Center. (D.E. 25, para 31).

- The attorneys have a close relationship with their detainee clients

"An attorney's relationship with his clients is undeniably a close one, and the Supreme Court has recognized the 'special consequence' of that relationship." *Fieger v. Ferry*, 471 F.3d 637, 650-51 (6th Cir. 2006) (concurrence). *See Caplin & Drysdale*, 491 U.S. at 623 n. 3 ("The attorney-client relationship... like the doctor-patient relationship... is one of special consequence"); *see also Triplett*, 494 U.S. at 721.

---

U.S. 715, 720 (1990) (attorney challenging restriction to clients' ability to retain counsel); *Singleton v. Wulff*, 428 U.S. 106, 113 (1976) (the law being challenged prevented doctors from being paid for performing certain services).

This is particularly true when "'[t]he activity sought to be protected is at the heart of the business relationship between [Plaintiffs] and [their] clients,' who contract for services and expect to receive adequate and meaningful representation." *Fieger*, 471 F.3d at 650-51 (quoting *Secretary of State of Md. v. Joseph H. Munson Co., Inc*., 467 U.S. 947, 958 (1984)). Defendants' invasion of detainees' rights interferes with attorneys' ability to represent their clients, which warrants allowing attorneys to exercise third-party standing on behalf of those clients.

- <u>The detainees face obstacles to asserting their own rights</u>

Finally, the nature of Defendants' invasion of detainees' rights makes it virtually impossible for many of those detainees to protect their own interests, because they are compromised in the short window of time between arrest and the opportunity to consult with an attorney. (D.E. 25, para 27-30).

First, a person who was recently arrested and hoping to be released on a personal recognizance bond needs an attorney's help, which means using the phone. He could easily share compromising privileged information without first knowing the call is monitored. Further, any unrepresented detainee trying to hire an attorney could easily disclose prejudicial information before knowing the risk. (D.E. 25, para 28).

Second, detainees will also risk irreparable injury if Defendants' practices force them to wait longer to receive legal advice. For instance, initial pleas – even for low-level charges – can have significant ramifications for an arrestee's immigration status. *See Padilla v. Kentucky*, 559 U.S. 356, 368 (2010) (the immigration consequences of an ill-advised plea are so dire that legal representation which does not explain them "falls below the objective standard of reasonableness"). Legal permanent residents and visa-holders need immediate access to an attorney before making a plea during the initial magistration. Even an undocumented arrestee could be eligible for relief from deportation through the Violence Against Women Act (VAWA)

as a victim of domestic violence; for a U-Visa, as a victim of other crimes; or for relief through the Deferred Action for Childhood Arrivals (DACA) program; but become ineligible with an ill-advised opening plea, even for a very minor charge like "possession of drug paraphernalia," a seemingly-innocuous fine-only Class C misdemeanor. The law does not require a magistrate provide an attorney to a defendant before accepting a guilty plea for a Class C misdemeanor. And once the harm is done, it can be virtually impossible to undo. (D.E. 25, para 29).

Similarly, if a person arrested on charges of "driving while intoxicated" (DWI) is delayed from speaking with an attorney, he could miss the opportunity to exercise an important statutory right: the Texas Transportation Code §724.109 allows a person charged with DWI to request a separate blood sample from their own health care provider if they make the request within two hours of being arrested.[13] Every minute that passes makes it less likely the detainee will learn about that opportunity in time to exercise it. (D.E. 25, para 30).

Ultimately, Detainees have no forum to seek recourse when these interests are damaged, because once the critical moment has passed, it's gone. The damage cannot typically be repaired. (D.E. 25, para 29). This weighs in favor of allowing attorneys to exercise third-party standing for the detainees.

- *Kowalski v. Tesmer* does not conflict with Plaintiffs' third-party standing

Defendants are incorrect to argue *Kowalski v. Tesmer* conflicts with the individual attorneys' third party standing to assert inmates' rights. 543 U.S. 125 (2004). The attorney-plaintiffs in *Kowalski* sought to challenge a Michigan statute which prohibited judges from appointing appellate counsel for indigent criminal defendants who had pled guilty. But nothing

---

[13] This is important, for instance, because a person who has unknowingly been given Flunitrazepam (i.e. Rohypnol or "a Roofie") would display the outward signs of intoxication and a breath sample would signal alcohol, giving the false impression of unlawful intoxication. The drug can only be revealed by a full blood analysis, which must be administered quickly before it is fully metabolized.

in *Kowalski* suggests Plaintiffs have not satisfied the elements for third-party standing (injury in fact, a close relationship, and the third party's difficulty asserting their own rights).

First, the *Kowalski* majority assumed the Michigan-plaintiffs had shown injury-in-fact by alleging they would have fewer clients because of the statute. 543 U.S. at 129 n.2. The opinion's dissent supports this assumption by pointing to a wealth of case law showing this sort of economic harm is an injury-in-fact. *See* 543 U.S. at 137-38 (Ginsberg, J.)(dissent). In this case, the individual plaintiffs have alleged an identical economic harm. (D.E. 25, para 31).

Second, *Kowalski* does not say Plaintiffs do not have the "requisite closeness" to inmates required by the second element on the test. A close reading of the *Kowalski* opinion shows the Supreme Court decided the case on the third element of the test (the non-party's ability to assert their own rights) and not on the second element (the plaintiff's "requisite closeness" with the non-party). The *Kowalski* opinion addressed the second element by distinguishing prior Supreme Court decisions that had accepted attorneys' third-party standing (*Caplin & Drysdale* and *Triplett*) by opining an "existing attorney-client relationship is… quite distinct from the hypothetical attorney-client relationship." 543 U.S. at 131. But this statement was *orbiter dictum* – "it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it."[14] *See U.S. v. Segura*, 747 F.3d 323, 238 (5th Cir. 2014) (citing *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir.2004)). As dictum, the statement is not binding on this Court. *Id*.

---

[14] The majority's less-than-full consideration is perhaps demonstrated by the dissent's collection of cases rebutting its conclusion, showing the Supreme Court's "prior decisions do not warrant the distinction between an 'existing' relationship and a 'hypothetical' relationship…" *See Kowalski*, 543 U.S. at 138-39 (Ginsberg, J.)(dissent).

And nevertheless, Plaintiffs circumstances are not limited to the "hypothetical" relationship envisioned by the *Kowalski* majority. They are more akin to the circumstances it describes from *Department of Labor v. Triplett.*

> In *Department of Labor v. Triplett, supra,* we dealt with the Black Lung Benefits Act of 1972, which prohibited attorneys from accepting fees for representing claimants, unless such fees were approved by the appropriate agency or court. An attorney, George Triplett, violated the Act and its implementing regulations by agreeing to represent claimants for 25% of any award obtained and then collecting those fees without the required approval.....

> *Triplett* is different from this case on two levels. First, *Triplett* falls within that class of cases where we have "allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights."

*Kowalski*, 543 U.S. at 131 (internal citations omitted). Plaintiffs' situation in this case tracks the situation in *Triplett*, because Defendants' violation of attorneys' rights under the Federal and Texas Wiretap Acts and the Fourth Amendment are interfering with inmates' rights to counsel and to access the courts.

Third, the *Kowalski* Court's conclusion regarding the Michigan convicts ability to asserting their own rights does not apply to the facts of this case. The Court noted "an indigent denied appellate counsel has open avenues to argue that denial deprives him of his constitutional rights." *Id*. at 131. It felt the Michigan plaintiffs filed to lawsuit to avoid pressing their claims in state court.

> It is a fair inference that the attorneys and the three indigent plaintiffs that filed this §1983 action did not want to allow the state process to take its course. Rather, they wanted a federal court to short circuit the State's adjudication of this constitutional question. That is precisely what they got.

*Id*. at 132-33. In our case, the harm to Travis County inmates cannot be remedied on appeal. Those harms, noted above, include imperiling their immigration status, spending extra time in

jail waiting for bond, or losing the opportunity to collect a blood sample as evidence. These are harms an appeal cannot rectify. Therefore, *Kowalski*'s does not apply to the facts of this case.

**C.  Defendants are legally responsible for Plaintiffs' harm and not immune from suit.**

1.  Securus is acting under color of while when it unlawfully invades privileged attorney-client communications.

Securus should be held liable for its role in violating Plaintiffs' constitutional rights because it is working in concert with the government defendants. *Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2005) ("a private individual may act under color of law in certain circumstances, such as when a private person is involved in a conspiracy or participates in joint activity with state actors"). Its violation of detainees' rights is the product of a detailed contractual agreement with the county that requires it to work in concert with local law enforcement.

The terms of the contract state that in the course of administering inmate phone services:

- "[Securus Technologies] shall provide inmate call recording and tracking"

- The recording and tracking must allow the Sheriff "to obtain a report of all calls from inmates' phones to a specific destination and then obtain a recording of the contents of the calls if needed"

- "[Securus Technologies] shall provide a storage method for the contents of inmate calls made within the previous six (6) months that allows County staff to search the data and retrieve the contents immediately"

(D.E. 25, para 14). Further, Securus makes the recorded phone calls accessible through an online user interface to local law enforcement, including the Sheriff's Department, and the District and County Attorneys' Offices. Securus Technologies gives them direct access to the database of recorded calls. (D.E. 25, para 12, 13, 16, 19). It also charges people in the free world for the privilege of speaking with detainees by phone and shares a substantial portion of the profit with Travis County. (D.E. 25, para 11).

Private individuals working hand-in-hand with law enforcement or corrections officials do so under color of state law and can be held liable for violating the Constitution. *See Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d 695, 698 (6th Cir. 2011) (company performing drug testing for state courts was acting under color of law); *Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 423 (8th Cir. 2007) (nonprofit organization running faith-based program in a prison was acting under color of law).

*Evans v. Skolnik*, which Defendants attached to their motions (D.E. 29-1), does not conflict with this reasoning. 3:08-cv-00353, Doc 117 (Oct. 2, 2009). In *Evans*, the plaintiff argued a private contractor was a state actor merely because it had a contract with the government to provide telephone services which the state unlawfully recorded. *Evans* at 7 n.4.

In this case, by contrast, Plaintiffs assert Securus is acting jointly with the government by intercepting and recording calls, storing them in a database for six months, and making them available to county police and prosecutors 24 hours a day. (DE 25, para 14). These allegation show Securus is engaged in joint activity with the other Defendants to violate Plaintiffs' rights. Therefore, it is acting under color of law when it invades detainees' constitutional rights, and may be held liable for those invasions.

2. Lehmberg, Escamilla and Hamilton are properly named as Defendants in their official capacities

Defendants cannot cite any type of immunity to prevent Plaintiffs' claims from going forward. First, counties themselves are not protected by sovereign immunity – only states and state departments. *United Disaster Response, LLC v. Omni Pinnacle, LLC*, 511 F.3d 476, 479 (5th Cir. 2007). Second, although prosecutors are considered state actors when acting in the scope of their prosecutorial capacity (as opposed to performing administrative tasks),[15]

---

[15] *Quinn v. Roach*, 326 Fed.Appx. 280, 292 (5th Cir. 2009).

Defendants Lehmberg and Escamilla are being sued in their official capacity for prospective relief, which is permitted under the *Ex Parte Young* doctrine.[16]

Similarly, prosecutors' absolute immunity does not bar suits for prospective relief. *Supreme Court of Va. v. Consumers Union of United States, Inc*., 446 US 719, 736-37 (1980) ("Prosecutors… are natural targets for § 1983 injunctive suits"); *see also Blakeney v. Marsico*, 340 Fed.Appx. 778, 779 (3rd Cir. 2009) (absolute prosecutorial immunity does not bar prisoners' §1983 claims for declaratory or injunctive relief). Qualified immunity is not applicable here, but even if it were, it would not bar claims for prospective relief. *Valley v. Rapides Parish School Bd*., 118 F.3d 1047, 1051 n.1 (5th Cir. 1997) ("It is well established law in this Circuit that the defenses of qualified and absolute immunity do not extend to suits for injunctive relief under 42 U.S.C. § 1983").

And finally, to the extent Defendants might normally be immune from state-based claims, the Texas Legislature has waived their immunity for violations of the Texas Wiretap Act. *See Garza v. Bexar Metropolitan Water District*, 639 F.Supp.2d 770, 775 (W.D.Tex. 2009) ("the definition of a 'person' who may be sued under the Texas Wiretap Act includes the government or a governmental subdivision or agency").

3. Plaintiffs' pleadings show Defendants had a practice warranting injunctive relief.

Defendants' have a persistent practice of invading privileged attorney-client conversations. (D.E. 25, para 16-19). Defendants' relevant policymakers were on notice this activity was occurring, and they allowed it to continue. (D.E. 25, para 20-23). Therefore, they should be held liable for injunctive relief.

---

[16] *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013) (constitutional claims); *Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 645-46 (2002) (violation of federal law).

First, the relevant policymakers had actual notice that their employees were engaged in these activities.[17] They condoned those practices, making their respective agencies liable. *Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 548 (5th Cir. 2008) ("It is well-established that a single unconstitutional action by a municipal actor may give rise to municipal liability if that actor is a final policymaker"). "Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information." *Bennett v. City of Slidell,* 728 F.2d 762, 768 (en banc) *rehearing denied,* 735 F.2d 861 (5th Cir.1984); *see also Kincheloe v. Caudle*, 2010 WL 1170604 *7 (W.D.Tex. 2010) (city retained officer after the public had filed many complaints against him). Even evidence showing policymakers recently discovered a practice but refused to put an end to it is sufficient to demonstrate "actual knowledge" that warrants liability. *Fennell v. Marion Independent School Dist.*, 963 F.Supp.2d 623, 640 (W.D.Tex. 2013) (family presented grievance to board of trustees but that board took no action).

Members of the Austin criminal defense bar contacted Defendants' policymakers in early 2013 with evidence their privileged phone calls with detainee clients were being recorded and passed to the hands of prosecutors. On information as belief, the Sheriff, County Attorney, District Attorney, and management of Securus all became aware of the issue at that point, but they did nothing to fix it. (D.E. 25, para 20).

---

[17] A sheriff is the final policymaker for a county regarding law enforcement activity. *Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir. 1990) (sheriff for law enforcement in the county). The District Attorney is final policymaker for her department when acting in her prosecutorial capacity. *Quinn v. Roach*, 326 Fed.Appx. 280, 292 (5th Cir. 2009). Plaintiffs assert the County Attorney is also a final policymaker for the county regarding legal matters, both by virtue of elected office (*c.f. Bolton*, 541 f.3d at 550 n. 4); and because, on information and belief (D.E. 25, para 20 n. 3), the County Commissioners' Court delegates policymaking authority over legal matters to the County Attorney's Office. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010) (policymaking authority can be delegated). Further, the County Attorney, when operating within his prosecutorial capacity, is an independent state actor and final policymaker for his department,. *Cf. Esteves v. Brock*, 106 F.3d 674, 677-78 (5th Cir. 1997) (district attorney is agent of the state while prosecuting, but agent of the county is administrative matters). Any leftover policymaking authority is held by the Travis County Commissioners' Court.

They were alerted again in late 2013 when members of the criminal defense bar conferred with Travis County and District Court judges, who in turn directly contacted the District and County Attorneys. On information and believe, this sparked another round of discussion among Defendants' final policymakers. But again, nothing was done. (D.E. 25, para 21).

The Travis County Commissioners Court was alerted to the matter on January 14, 2014, when they were told at an open meeting that attorneys' privileged calls with clients in the jail were being recorded and shared with prosecutors. The Commissioners were simultaneously cc'd on a spoliation letter to Securus, regarding the matters at issue here. Again, Defendants did nothing to prevent calls from being intercepted, recorded, and shared with prosecutors. (D.E. 25, para 22).

Second, even if Defendants did not have actual knowledge, they had constructive knowledge. *See Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (constructive knowledge is a basis for liability).

> Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Bennett,* 728 F.2d at 768. Securus Technologies and the Sheriff's Department were aware early on they were operating a system that captured and recorded privileged conversations. Securus, in particular, has been aware of virtually identical complaints from other parties of the country where it provides services. (D.E. 25, para 18).

Attorneys and investigators with the County and District Attorneys' Offices, from top to bottom, have had direct access to the county's database of recorded attorney calls for years. Senior-level members of the prosecutors' offices were aware that confidential conversations were being recorded. Low-level prosecutors have given defense attorneys copies of recorded

calls as discovery materials, which contained the attorneys' privileged discussion with their clients. (D.E. 25, para 19). Securus entered into a contract for the explicit purpose of allowing this to happen. (D.E. 25, para 12-14).[18]

The practice of recording attorney's calls was quite well known among Defendants – more than enough to give policymakers both actual and constructive knowledge.

CONCLUSION

Plaintiffs have successfully alleged claims under state and federal law, and the U.S. Constitution. They have standing to assert them. Defendants have no level of immunity protects them from suit.

For these reasons, Plaintiffs respectfully ask that Defendants' motions be denied.

DATED: September 3, 2014

---

[18] Defendant Securus cites *Peterson v. City of Fort Worth* to challenge Plaintiffs' assertion of liability. 588 F.3d 838 (5th Cir. 2009). But *Peterson* bears no relationship to this case – it asks whether police officers' misconduct was part of a pattern of conduct "for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Id.* at 850 (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir.1984) (en banc)).

In this case, there is no need to infer Securus was on notice of persistent conduct because the complaint alleges Securus knowingly entered into a contract to violate Plaintiffs rights (akin to a facially unlawful policy), and that it was put on actual notice by Plaintiffs and other attorneys several times but remained a part of this unlawful joint endeavor. Actual notice establishes liability. *See supra*, p. 26.

Respectfully submitted,

 /s/ Brian McGiverin
Brian McGiverin
Texas Bar No. 24067760
brian@texascivilrightsproject.org

Wayne Krause Yang
State Bar No. 24032644
James C. Harrington
Texas Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Dr.
Austin, Texas 78741
Tel. (512) 474-5073
Fax (512) 474-0726

Attorneys for the Individuals, the
Austin Lawyers Guild, and the
Prison Justice League

 /s/ George C. Lobb
George C. Lobb
Texas Bar No. 24042928

Law Office of George C. Lobb
1108 Lavaca Street, #110-242
Austin, TX 78701
Tel. (512) 215-6011
Fax. (512) 425-0877

Attorney for the Individuals and the
Class

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served on all counsel of record who have appeared in this matter through the Electronic Case Files System of the Western District of Texas.

/s/ Brian McGiverin
Brian McGiverin